HARMON v. STATE..

(In Banc.   Dec. 11, 1933.)

[150 So. 904.   No. 30786.]

418

Calhoun, Rosenthal & Capers, and **J. Ed. Franklin**, all of Jackson, for appellant.

**W. D. Conn, Jr.,** Assistant Attorney-General, for the state.

**Ethridge, J.,** delivered the opinion of the court.

The appellant, Annie May Harmon, was indicted and convicted of the murder of her husband, Joseph Harmon, in the first district of Hinds county, and sentenced, by the jury, to suffer death.

The deceased, Joseph Harmon, was killed in the city of Jackson on the morning of December 27, 1932. There were no eyewitnesses to the killing, but shortly thereafter three policemen of the city of Jackson went to the scene of the homicide and saw the body of the deceased lying face downward, hand outstretched, near the steps, with a shotgun wound two inches in diameter in the back which widened as it penetrated his body. It was a rainy morning, and, when the police arrived, there were no tracks around the body and no weapon upon or near the de-

ceased; but, being informed that the appellant had done the shooting, they proceeded in the direction in which she had gone, which was toward police headquarters, and overtook and arrested her. They asked her who shot the deceased, and she said that she did, and that she shot him because he needed shooting. She said, "I killed him. Now take and hang me. Do what you want with me. You hung my brother for killing a white man. Do what you want with me."

The statement as to her brother being hung was excluded, but the rest of the statement was held to be competent, and the court instructed the jury not to consider such statement as to her brother.

The policemen took the appellant in their car and returned to the house where the killing occurred, and, according to their evidence, she there stated voluntarily she and her husband had a quarrel, and that he beat her, and, after doing so, he started to leave, and she told him she would kill him if he left; that he proceeded out of the back door, and she got the shotgun and found a shell and shot him.

When the gun was fired, a neighbor, who was a witness in the case, said he heard it and went to the backyard fence and saw the deceased lying face downward; that he stayed there and watched until the law (referring to the police) arrived, and then went back into his house and had no conversation at the time with them. After the appellant was brought back to the scene of the homicide, she made a detailed statement as to the killing, to the effect that she shot him because she told him not to leave the house. The policemen left at the house where the deceased was killed kept the crowd which had assembled from going near the body. They testified that there were no tracks or weapons near the body.

The appellant's testimony was that she had no difficulty about her husband "playing out," but that she had been assaulted on the morning of the killing; that her husband

had beaten her, and said he was going to the woodpile, get the ax, and come back and split her head open. He said he had an uncle in Texas who was a policeman, and who did not take any "mess off of white or black;" that, as the deceased was approaching with the ax, she got the gun and fired, and then turned and went into the room where her mother was, put on her shoes and stockings, and started to the police headquarters to give herself up. She further testified that about two weeks before the killing he had beaten her to such an extent as to cause her to have a miscarriage, and that she had been in bed practically all the time since, in a very weakened condition; that, on the Sunday preceding the killing, she had gone in a car to her uncle's home, which was in another part of the town, and that her husband was mad about this; that on the day before the killing she had gone with her husband to a picture show, but that her husband was brutal and whipped her on numerous occasions. She also introduced witnesses who testified that they went to the scene of the killing prior to the arrival of the policemen, and that the deceased was lying on his back with his ax near one of his hands, and that they kicked the ax away and turned the body over in the position in which it was found by the policemen.

The appellant assigns as error the statement testified to by the policemen as to her brother being hung for killing a white man, and that she said she killed her husband because he needed killing. As stated above, the judge excluded that part of the statement about her brother being hung for killing a white man, and the jury was instructed not to consider it.

It is next assigned as error the giving of the following instruction for the state: "The court instructs the jury for the state that unless, at the time the defendant killed the deceased, the defendant was in real or apparent danger of losing her life, or receiving serious bodily injury at the hands of the deceased, and the killing was

unavoidable except by flight, they must find the defendant guilty."

We have examined all the instructions for the state and for the appellant, and, when taken as a whole, they give the law fully, and, we think, correctly.

The latter part of the instruction just quoted that the killing was unavoidable except by flight may be technically erroneous. The killing was not necessarily unavoidable only by flight. The instruction told the jury that the appellant was authorized to act on danger reasonably apparent, and, when taken as a whole, we must construe it as to embrace an apparent necessity, and not one absolutely unavoidable by any other means than flight. On the whole, we are satisfied that the jury was not misled, and that the instruction is not subject to the construction placed upon it by the argument.

The following instruction refused for the defendant is next assigned as error: "The court instructs the jury for the defendant that if they believe, from the evidence, that the defendant made any confessions or admissions of guilt, such confessions or admissions are to be received by them with great caution, and unless supported by other proof in the case, are not sufficient to convict." The appellant was granted other instructions, and had one in exactly the same language as the one just quoted down to the word "caution," omitting the concluding clause thereof.

We think the conviction of the appellant did not depend entirely upon the confession. The corpus delicti was fully established. The deceased was shot, and, according to the state's evidence, there was no weapon upon or near him, and, consequently, the version of the appellant was discredited by this testimony. There was also other evidence to connect the appellant with the crime. Immediately after the shooting, she left home, and another witness saw the body a few minutes after the shooting and remained on watch until the policemen arrived, if his

testimony is to be believed. In addition to that, the mother of the appellant and another witness testified that the appellant did the shooting.

We have examined the evidence and all the evidence assigned with care, on account of the extreme penalty inflicted. The evidence is sufficient to show clearly that the appellant was guilty, and it was the province of the jury alone to say that, if the defendant should be found guilty, she should suffer the death penalty or be imprisoned for life. We have no jurisdiction over their verdict in this regard. The judgment is therefore affirmed.

Affirmed, and Wednesday, January 17, 1934, fixed as the date of execution.